IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | | |
|---|---|---|
| OREGON NATURAL DESERT ASS'N and WESTERN WATERSHEDS PROJECTS, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 04-334-KI |
| vs. | ) ) | OPINION |
| WAYNE WETZEL, Acting Field Manager, Jordan Resource Area, BLM, DAVE HENDERSON, Vale District Manager, BLM, BUREAU OF LAND MANAGEMENT, | ) ) ) ) ) ) | |
| Defendants. | ) | |

Peter M. Lacy
Oregon Natural Desert Association
917 S. W. Oak Street, Suite 408
Portland, Oregon 97205

Stephanie M. Parent
Pacific Environmental Advocacy Center
10015 S. W. Terwilliger Blvd.
Portland, Oregon 97219

    Attorneys for Plaintiffs

Karin J. Immergut
United States Attorney
District of Oregon
Stephen J. Odell
Assistant United States Attorney
United States Attorney's Office
1000 S. W. Third Avenue, Suite 600
Portland, Oregon  97204-2902

Bradley Grenham
Special Assistant United States Attorney
Office of the Regional Solicitor
United States Department of the Interior
500 N. E. Multnomah Street, #607
Portland, Oregon  97232

       Attorneys for Defendants

KING, Judge:

Plaintiffs Oregon Natural Desert Association ("ONDA") and Western Watersheds Project bring an action against the Bureau of Land Management ("BLM") and two individual BLM managers regarding the BLM's adoption of an "interim grazing management strategy" in the Louse Canyon Geographic Management Area ("LCGMA"), in southeast Oregon.  Plaintiffs bring this action for declaratory and injunctive relief under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1784, and its implementing regulations, 43 C.F.R. Subpart 4180.  Their right of judicial review is provided by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  Before me are the previously deferred cross-motions for summary judgment (#10, #25) on plaintiffs' second claim for relief.  For the reasons below, I deny plaintiffs' motion for summary judgment and grant defendants' motion for summary judgment.

## BACKGROUND

I provided the relevant procedural and factual background in the Opinion and Order dated January 18, 2005 ("Opinion and Order"). I reiterate here the salient points.

Pursuant to the Federal Rangeland Health ("FRH") regulations, the implementing regulations of FLPMA, the BLM was required to develop state or regional standards and guidelines in conformance with the "fundamentals of rangeland health" for the management of livestock grazing on BLM lands. 43 C.F.R. § 4180.1, 4180.2. The BLM Oregon/Washington State Office developed standards and guidelines, which were approved by the Secretary of Interior on August 12, 1997, entitled "Standards for Rangeland Health and Guidelines for Livestock Management for Public Lands Administered by the Bureau of Land Management in the States of Oregon and Washington" ("Standards and Guidelines"). AR Tab 10.

The BLM developed the "Rangeland Health Standards Handbook H-4180-1" to implement the regulations. AR Tab 8. The Handbook requires the BLM to conduct rangeland health assessments and evaluations to determine whether the rangeland is conforming to the Standards and Guidelines. On November 6, 2003, the BLM issued the Louse Canyon Geographic Management Area ("LCGMA") Evaluation, presenting its assessment, evaluation and determination of that area's rangeland health ("Evaluation"), the first of eight GMAs to receive an evaluation. AR Tab 12. The BLM noted in the Evaluation that several identified pastures in the LCGMA had specific areas within them that were failing to achieve certain Standards and Guidelines as a result of grazing, based on determinations it had completed on December 7, 2001.

In particular, the BLM noted violations of Standard 2, requiring "riparian-wetland areas to be in properly functioning physical condition appropriate to soil, climate, and landform." AR

Tab 12 at 1-5. In addition, the BLM identified violations of water quality, Standard 4, and terrestrial species, Standard 5, but grazing was a significant factor in failures to meet Standard 5 only with respect to plants in riparian areas. AR Tab 12 at 3-8, 3-16, 3-33, 3-36, 3-39, 3-46.

Once the BLM determines a standard is not being met, the governing regulatory language requires the following:

> The authorized officer shall take <u>appropriate action</u> as soon as practicable but not later than the start of the next grazing year upon determining that existing grazing management practices or levels of grazing use on public lands are significant factors in failing to achieve the standards and conform with the guidelines that are made effective under this section. <u>Appropriate action</u> means implementing actions pursuant to subparts 4110, 4120, 4130, and 4160 of this part <u>that will result in significant progress</u> toward fulfillment of the standards and significant progress toward conformance with the guidelines. Practices and activities subject to standards and guidelines include the development of grazing-related portions of activity plans, establishment of terms and conditions of permits, leases and other grazing authorizations, and range improvement activities such as vegetation manipulation, fence construction and development of water.

43 C.F.R. § 4180.2(c) (emphasis added).

The BLM implemented what it called its interim grazing management strategy. The Evaluation contains a two-paragraph summary of the strategy, describing it as a reduction in "hot season" grazing "in order to allow herbaceous regrowth in wet areas after the grazing season." The hot season is typically the period of time between July 1 and October 31. AR Tab 15 Vol. 2 at 382. According to the BLM's statement in the Evaluation, the interim grazing management strategy reduced grazing during the hot season by 50 to 62%. The interim strategy was created in cooperation with the permittees. The Interim Grazing Management Use Dates (Beginning 2002) for the areas negatively affected by grazing are as follows:

| Pasture | Interim Use |
|---|---|
| Horse Hill | 4/01-7/15 |
| Starvation BC | 7/16-9/30 |
| Steer Canyon Seeding | 5/16-5/31<br>7/16-9/31 |
| Lower Louse Canyon | 4/15-7/15 |
| Upper Louse Canyon | 3/16-8/01 |
| Pole Creek Seeding | 7/16-9/31 |
| Steer Canyon Seeding | 7/16-9/31 |
| South Tent Creek | 6/01-7/15<br>9/5-9/20 |

AR Tab 12 at Table 7.

Meanwhile, the BLM initiated an analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., of a range of alternatives for its final strategy, based on the recommendations and proposed management options listed in the Evaluation. The BLM issued the LCGMA Environmental Assessment and Finding of No Significant Impact for public review and comment in September 2004, and issued proposed decisions on February 28, 2005. Protests to the proposed decisions were submitted to the agency. The BLM has not yet implemented its final grazing management strategy.

In the January Opinion and Order, I granted defendants' motion for summary judgment on plaintiffs' first claim for relief, finding that plaintiffs had not challenged a discrete, final agency action in that claim. In addition, I noted that plaintiffs' second claim was most appropriately analyzed not as a claim for agency inaction, but rather as a claim for agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law

pursuant to Section 706(2)(A) of the APA.  Since neither of the parties had extensively briefed the second claim on this basis, I requested supplemental briefs.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Where plaintiffs' challenge is brought under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the court must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  City & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997).

The APA authorizes a court to "hold unlawful or set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  To obtain judicial review under this section, a plaintiff must establish that the activities at issue are "final agency actions."  Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990).  For an agency action to be considered final under the APA, two conditions must be satisfied.  First, the action "must mark the consummation of the agency's decisionmaking process," and second, it "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  Bennett v. Spear, 520 U.S. 154, 177 (1997) (internal citations and quotations omitted).

In reviewing an agency decision under this standard, courts "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 378 (1989) (citation omitted).  "An agency action is also arbitrary and capricious if the agency fails to 'articulate a satisfactory explanation for its action including a rational connection between the facts found and

the choice made.'" Friends of the Wild Swan, Inc. v. U.S. Fish & Wildlife Serv., 12 F. Supp.2d

1121, 1131 (D. Or. 1997) (quoting Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.,

463 U.S. 29, 43 (1983) (further citations omitted)).

## DISCUSSION

Plaintiffs' second claim for relief, as modified by its briefing, alleges that the BLM acted

arbitrarily and capriciously in relying on the interim grazing management strategy in the LCGMA

for four successive years, and that the strategy does not satisfy the FRH regulations' "appropriate

action" requirement. Both parties argue they are entitled to summary judgment on plaintiffs'

second claim.

Before addressing the merits of the cross-motions, I resolve defendants' justiciability

arguments.

I.      Defendants' Justiciability Arguments

        A.      Applicability of Norton v. Southern Utah Wilderness Alliance ("SUWA")

Although defendants did not initially challenge plaintiffs' second claim for relief on the

basis that plaintiffs had failed to seek review of a discrete and legally required agency decision,

they do so now. Defendants argue that even as more fully fleshed out in their supplemental brief,

plaintiffs' second claim is at bottom a request for the court to compel the BLM to complete its

NEPA analysis and finalize its grazing management changes–in short, to compel withheld or

delayed agency action. According to defendants, Norton v. Southern Utah Wilderness Alliance

("SUWA"), 542 U.S. 55, 124 S. Ct. 2373 (2004) limits review of "insufficient action"

allegations. In SUWA, the duty to "continue to manage [the areas] . . . in a manner so as not to

impair the suitability of such areas for preservation as wilderness" was not sufficiently discrete

and mandated to constitute "agency action unlawfully withheld or unreasonably delayed" under section 706(1) of the APA. <u>SUWA</u>, 524 U.S. 55, 124 S. Ct. at 2377, 2379.

Plaintiffs charge arbitrary and capricious agency action as opposed to agency action unlawfully withheld. Moreover, the statutory language at issue in <u>SUWA</u> is different in kind from the regulatory language plaintiffs invoke. As I noted in the Opinion and Order, "[T]he regulation imposes a clear, mandatory duty on the agency (including a defined timeframe) once the agency makes a decision; i.e., after a determination is made that standards and guidelines are not being met due to grazing activities." Opinion and Order at 11. I reject defendants' argument that plaintiffs' arbitrary and capricious pleading formulation is "window dressing."

B.    <u>Mootness of Plaintiffs' Challenge</u>

Defendants argue plaintiffs are simply attempting to compel the BLM to finalize a long-term LCGMA grazing strategy, and the BLM reports it has issued the decision and is in the process of resolving the protests it received. According to defendants, the interim grazing strategy will "very shortly be superseded and rendered moot as soon as the long-term grazing strategy becomes final." Defendants' Supp. Reply at 8. As a result, defendants urge the court to find that plaintiffs' claim is moot.

It is a heavy burden to demonstrate mootness. <u>Cantrell v. City of Long Beach</u>, 241 F.3d 674, 678 (9th Cir. 2001). Furthermore, "completion of activity is not the hallmark of mootness. Rather, a case is moot only where no effective relief for the alleged violation can be given." <u>Neighbors of Cuddy Mountain v. Alexander</u>, 303 F.3d 1059, 1065 (9th Cir. 2002).

Here, as plaintiffs point out, if I found that the BLM's action was arbitrary and capricious, I could order mitigation. <u>See</u> <u>Forest Guardians v. U.S. Forest Service</u>, 329 F.3d 1089, 1094 (9th Cir. 2003) ("district court could order [defendant] to develop tactics to mitigate the damage

caused by the violation, such as moving or removing livestock from the allotments so the land

can repair itself").  Since effective relief is still available to plaintiffs, the action is not moot.  See

id.

     C.    <u>Ripeness of Plaintiffs' Challenge</u>

Defendants also assert that the interim grazing management strategy is merely a first step

in a larger management action and that I should await the finalization of that long-term

management strategy pursuant to "principles of prudential ripeness."  Defendants' Supp. Reply at

9.

The justiciability doctrine of ripeness is intended "to protect the agencies from judicial

interference until an administrative decision has been formalized and its effects felt in a concrete

way by the challenging parties."  <u>National Park Hospitality Ass'n v. Department of Interior</u>, 538

U.S. 803, 807-8 (2003) (citation omitted).

Plaintiffs challenge a decision of the BLM that has been in place for four years, and that

decision is ripe for judicial review.  Although the administrative record for the long-term grazing

management strategy, when it is eventually adopted by the BLM, will certainly provide an in-

depth view of the BLM's decision-making process for that particular decision, plaintiffs are not

challenging the final strategy.  Instead, plaintiffs challenge the BLM's decision to implement an

interim grazing management strategy as its "appropriate action"; that decision is ripe for judicial

review.

II.    <u>Merits of the Cross-Motions</u>

     A.    <u>BLM's Interpretation of the Regulations</u>

As explained in more detail above, in December, 2001, the BLM made a determination

that existing grazing management practices were significant factors in failures of specified public

lands to meet the Standards and Guidelines. The determination triggered the BLM's duty, pursuant to 43 C.F.R. § 4180.2(c), to take "appropriate action as soon as practicable but not later than the start of the next grazing year . . . ." According to the regulation, "Appropriate action means implementing actions pursuant to subparts 4110, 4120, 4130 and 4160 of this part that will result in significant progress toward fulfillment of the standards and significant progress toward conformance with the guidelines." 43 C.F.R. § 4180.2(c) (emphasis added).

Plaintiffs assert in a footnote that the BLM's definitions for the regulatory term "significant progress," which are contained in the BLM's Rangeland Health Standards Handbook and in the Standards and Guidelines, are entitled to little deference, citing Christensen v. Harris County, 529 U.S. 576, 587 (2000). Christensen, however, held that agency interpretations of a *statute* contained in an opinion letter, policy statement, agency manual or enforcement guidelines are entitled to less deference. Christensen, 529 U.S. at 587. An agency's interpretation of its *regulation*, even if contained in a handbook or agency manual, is controlling if the language of the regulation is ambiguous, unless the interpretation is plainly erroneous or the interpretation is inconsistent with the regulation. Auer v. Robbins, 519 U.S. 452, 461 (1997); Christensen, 529 U.S. at 588.

The BLM has defined "significant progress" to mean: (1) "[m]ovement toward meeting standards and conforming to guidelines that is acceptable in terms of rate and magnitude. Acceptable levels of rate and magnitude must be realistic in terms of the capability of the resource, but must also be as expeditious and effective as practical," AR Tab 8 at I-7; and (2) "a rate of progress that is consistent with the anticipated recovery rate described in plan objectives, with due recognition of the effects of climatic extremes (drought, flooding, etc.), fire, and other unforeseen naturally occurring events or disturbances." AR Tab 10 at 21.

Here, the term "significant progress" is ambiguous, and the BLM's definitions for "significant progress" are not plainly erroneous or inconsistent with the regulation. Indeed, plaintiffs have not argued to the contrary. Accordingly, the BLM's constructions of the regulation are controlling. Auer, 519 U.S. at 461.

Plaintiffs offer additional constructions of 43 C.F.R. § 4180.2(c). First, plaintiffs assert that the regulation does not permit temporary measures like the interim grazing management strategy. However, as defendants point out, the regulation does not prohibit interim measures. In addition, in its Rangeland Health Standards Handbook, the BLM specifically anticipates the need for interim measures, providing:

> If changes are to be made in the terms and conditions in the permit, they must be in place before the start of the next grazing season. Any proposals to implement restoration and range improvement projects must take into consideration the ability to budget these projects and implement appropriate actions before the beginning of the next grazing season. If other necessary actions cannot be implemented right away, then interim adjustments will be made prior to the next grazing season, and a schedule for "final" changes must be developed and documented.

AR Tab 8 at III-17. So long as any chosen interim measure constitutes an "appropriate action," the Handbook's description of the regulation is not contrary to the terms of the regulation. I decline to accept plaintiffs' statement that the regulations do not provide for interim measures.

In a similar argument, plaintiffs assert that the regulation requires the BLM to finalize its grazing management strategy. See e.g. Plaintiffs' Supp. Memo. at 7 ("The fact that photographs . . . purportedly show 'general, but subtle, improvement,' . . . is irrelevant to the question whether the BLM is satisfying the requirements of 43 C.F.R. § 4180.2(c) when the agency fails to finalize any grazing management changes or even develop a plan to finalize such changes, in three consecutive grazing seasons following multiple determinations of failed standards"). The plain

language of the regulation itself requires only that the BLM take "appropriate action"–put in place measures that will achieve significant progress toward fulfilling the Standards and Guidelines before the start of the next grazing season, without regard to any "finality" of the measure. While the Handbook contemplates a schedule for final changes, it does not mandate that a final decision be adopted within a specified period of time.

Plaintiffs also assert that the regulation means that the BLM has a continuing duty to take "appropriate action." Neither the regulation itself nor the commentary accompanying adoption of the regulation imposes a continuing duty upon the BLM to revisit its chosen measure, unless the agency has again "determin[ed] that existing grazing management practices or levels of grazing use . . . are significant factors in failing to achieve" the Standards and Guidelines.[1] Nevertheless, if the chosen measure does not achieve the mandate of significant progress toward meeting the Standards and Guidelines in the first place, it is not an "appropriate action."

B.    Extra-Record Evidence

Defendants rely on photographs from 2001 and 2002 to support their claim that reducing "hot season" grazing resulted in significant progress toward meeting the Standards and Guidelines. These photographs are in the administrative record. The Field Manager for the Jordan Resource Area, Jerry Taylor, describes the photographs in an affidavit as follows:

> Prior to implementation of the interim grazing measures in 2002, Jordan Resource Area (JRA) staff set up grazing exclosure cages in certain riparian areas and took pictures to document the re-growth potential and to provide an ungrazed comparison. In addition, JRA staff secured other existing pictures showing conditions before interim grazing to be used for comparison with pictures taken after the interim grazing strategy was implemented. After the 2002 grazing

---

[1]Along these lines, I note that the Rangeland Health Standards Handbook requires the BLM to "[c]ollect and evaluate inventory and monitoring data on a regular basis as needed to determine achievement of . . . Standards, or progress toward achieving those Standards."

season, these pictures were retaken and compared to see if we were headed in the right direction.  What we saw was <u>general, but subtle, improvement</u>.  <u>More cover remained, more armoring with sedges and rushes was evident, and less trampling was observed.</u>

Taylor Dec. at ¶ 16 (emphasis added).

In addition, Taylor explains that the interim grazing management strategy was modeled after the BLM's successes in riparian recovery on threatened Lahontan cutthroat trout habitat in the Trout Creek GMA, which is located to the west of the LCGMA.  In that area, according to Taylor, streams have re-vegetated; vegetation diversity has improved; the stream channels have narrowed and deepened and become more sinuous; the water tables have come up; and Lahontan cutthroat trout have increased in number.  Taylor Dec. at ¶¶ 10, 11.

Neither the explanation of the photographs nor the discussion about the success of the strategy on the Trout Creek GMA is in the administrative record.

Plaintiffs assert that the BLM's decision must be upheld only on the basis of the reasoning found in the Evaluation.  <u>Anaheim Mem'l Hosp. v. Shalala</u>, 130 F.3d 845, 849 (9th Cir. 1997); <u>Asarco, Inc. v. U.S. EPA</u>, 616 F.2d 1153, 1159 (9th Cir. 1980).  Defendants respond that the BLM had limited time in which to develop the interim grazing management strategy to ensure that it could be put into effect prior to the start of the next grazing season, and as a result the record is also limited.

The Ninth Circuit allows a reviewing court to consider extra-record materials in an APA case only under four narrow exceptions:  (1) when it needs to determine whether the agency has considered all relevant factors and has explained its decision; (2) when the agency has relied upon documents or materials not included in the record; (3) when it is necessary to explain technical terms or complex matters; and (4) when a plaintiff makes a showing of agency bad

faith.  Southwest Center for Biological Diversity v. United States Forest Service, 100 F.3d 1443, 1450 (9th Cir. 1996) (citations omitted).  Furthermore, "additional information should be explanatory in nature, rather than a new rationalization of the agency's decision, and must be sustained by the record."  Kunaknana v. Clark, 742 F.2d 1145, 1149 (9th Cir. 1984).

Following these guidelines, I will consider Taylor's description of the photographs as I find that such description is merely explanatory of the depictions which were included in the administrative record.  However, I will not consider Taylor's assertion that the interim grazing management strategy was modeled after purported successes in the Trout Creek GMA.  The BLM neglects to reference the strategy on the Trout Creek GMA in the two paragraphs of the Evaluation dedicated to the interim grazing management strategy, making it difficult to confirm whether it was a rationalization for the agency's decision.  In addition, Taylor does not reference or attach any research studies, monitoring results, photographs, watershed assessments, or published scientific literature documenting the purported successes in the Trout Creek GMA.  Furthermore, it is not altogether clear from the record whether purported successes in the Trout Creek GMA were due solely to reductions in hot season grazing.  The Proposed Southeast Oregon Resource Management Plan and Final EIS ("Proposed SEORMP") reports that the BLM "signed a rest agreement with permittees which called for livestock removal for 3 years to allow improvement of riparian conditions.  Meanwhile the BLM developed alternative livestock grazing strategies, including reduction in season of use, shift to early season use, reduction in AUM's, and construction of range improvement projects."  AR Tab 15, Vol. 1 at 351. Accordingly, I find that this portion of the Taylor declaration offers new, unsupported information not included in the record and I will not consider it.

C.    Interim Strategy Arbitrary and Capricious

 I must now determine whether the BLM acted arbitrarily and capriciously in concluding that the interim grazing management strategy constitutes an "appropriate action," as defined by the BLM in its Handbook and in its Standards and Guidelines.

According to plaintiffs, the only action the BLM implemented prior to the next grazing season was a reduction in "hot season" grazing, characterized by plaintiffs as simply moving the same livestock numbers and amount of forage allocated to domestic livestock grazing slightly earlier in the permitted grazing season.  According to plaintiffs, the BLM acted in an arbitrary and capricious fashion because the environmental damage has continued even under the interim grazing management strategy, the interim grazing management strategy failed to account for drought conditions in the LCGMA, and the strategy permitted spring grazing that exacerbates compaction of wet soils, resulting in environmental damage from hoof action–the other reason why many of the streams and wetlands were deemed to be failing to meet Standards and Guidelines.

1.    Continuing Environmental Harm

As evidence of continuing environmental harm, even under the interim strategy, plaintiffs point first to LCGMA Wildlife Habitat Evaluation, which identified "high livestock and generally weak understory conditions" at specific streams, "heavy livestock grazing use such as damaged shrub structure and depleted understory conditions" in isolated mountain and/or Great Basin sage communities, and "particularly severe" livestock utilization around watering troughs in seeded areas.  AR Tab 11 at 11.  Plaintiffs emphasize the BLM noted, "All wet meadow habitats showed signs of heavy utilization and little residual cover is available in the fall due to domestic livestock use."  Id.

The LCGMA Wildlife Habitat Evaluation was conducted prior to the implementation of the interim grazing management strategy. In addition, I note that the LCGMA Wildlife Habitat Evaluation offered a mitigation recommendation for the environmental problems discussed above. It stated, "Nevertheless, rest and/or other seasonal grazing use adjustments that avoid repeated annual summer use are needed so that raw soil surfaces may decreased [sic] and plant vigor/composition can be improved." That is exactly the tact the BLM took in implementing the interim grazing management strategy.

As additional evidence of continuing environmental harm, plaintiffs rely on stream health statistics in the Evaluation. Again, the assessments reported in the Evaluation were completed prior to the implementation of the interim grazing management strategy. The Evaluation identified streams not meeting Standard 2 (Watershed Function-riparian/wetland), accounting for one-third of the streams in the LCGMA, and 30 springs "not functioning properly due to livestock trampling, overgrazing, or dewatering by developments." AR Tab 12 at 2-31 to 2-34, Table 4a, AR Tab 13 (Errata Sheet); AR Tab 12 at 2-53 (citing Table 4b). These statistics are helpful only in confirming that the BLM needed to take "appropriate action." They do not speak to whether the BLM acted arbitrarily and capriciously in choosing the interim grazing management strategy as that "appropriate action."

Finally, plaintiffs explain that the harm they are most concerned about is the ongoing impact of livestock grazing on wilderness values. According to the executive director of ONDA, BLM's "past failure to protect these public lands from the impacts of livestock grazing adversely limits the ability of public lands to be considered for future consideration as wilderness by Congress." Marlett Dec. ¶ 10. ONDA has created a list of areas that it believes are deserving of wilderness protection, and it is these areas about which ONDA is concerned. However, neither

the briefing nor the Marlett Declaration confirms that the riparian areas to which the interim grazing management strategy applies are the very same that ONDA believes are deserving of wilderness protection.

While I recognize that there may be ongoing environmental harm that the interim grazing management strategy fails to address, plaintiffs have not adequately demonstrated such environmental harm.

2.    Drought and the Interim Grazing Management Strategy

In his declaration, Taylor explains that the LCGMA "has been under prolonged drought conditions." Taylor at ¶ 14. Plaintiffs assert that the interim grazing management strategy, relying on "herbaceous regrowth," is not an effective strategy in drought conditions, and they contend that the BLM recognized this fact.

In support of their assertion that "herbaceous regrowth" is not an effective strategy in drought seasons, plaintiffs cite S. Leonard, et al., Riparian Area Management:  Grazing Management for Riparian-Wetland Areas, a BLM and United States Forest Service publication. Plaintiffs' Supp. Memo. at 17 n.9.  Having read the cited pages, I am unable to find any statement to that effect.

In addition, plaintiffs rely on a letter the BLM sent to its permittees, after two years under the interim strategy.  Plaintiffs quote a portion of the letter as follows:  "Prolonged drought stress, in addition to grazing, is having detrimental impacts on plant health, plant vigor and forage production on much of our low and mid elevation rangeland."  AR Tab 18 at 1.  In the letter, the BLM noted the "impacts we have documented will not be erased by one or two good precipitation years" and encouraged permittees "to consider reducing your numbers to build in flexibility."  Id.  Plaintiffs assert that in this letter, the BLM recognized that the interim grazing

management strategy has not been successful in achieving significant progress toward meeting the Standards and Guidelines.

BLM explains that the letter was sent to all permittees within the several million acres of the Vale District, and is not specific to the LCGMA. Furthermore, the letter does not discuss the health of riparian areas. Indeed, I find that the letter does not reflect the BLM's belief that the interim grazing management strategy failed to initiate significant progress in achieving the Standards and Guidelines.

Plaintiffs also argue that the BLM's analysis of the benefits of spring grazing ignores the BLM's own conclusions about spring grazing during a drought. According to defendants, the BLM adopted the interim grazing management strategy in recognition that hot season grazing can harm riparian vegetation. In the two paragraphs setting forth the interim grazing management strategy in the Evaluation, the BLM states, "Duration of hot season grazing was reduced 50% to 62% in order to allow herbaceous regrowth in wet areas after the grazing season." AR Tab 12 at 1-2. In its briefing, the BLM relies on a discussion in the Proposed SEORMP about how spring grazing allows regrowth and plant recovery, and allows for better livestock distribution between riparian areas and upland areas because upland areas offer palatable forage during the spring. Tab 15, Vol. 2, at 381.

However, according to plaintiffs, the Proposed SEORMP concludes that under spring grazing (February 1 to May 1), "[m]inimal impacts to plant vigor and health" occur under "light to moderate" utilization but only "when adequate soil moisture is available for regrowth and completion of the annual growth cycle." AR Tab 15, Vol. 2 at 380. On the other hand, "[m]oderate utilization, in years with minimal soil moisture available for regrowth after use, could deplete plant vigor and health, especially during periods of critical growth." Id. Yet,

according to plaintiffs, the BLM allows a maximum livestock utilization of "moderate."
Therefore, according to plaintiffs, the Proposed SEORMP indicates that the levels of grazing
authorized in these pastures may cause resource damage during periods of drought.

Having reviewed the record myself, I note that the South Tent Creek, Upper and Lower
Louse Canyons, and Pole Creek Seeding permit a maximum livestock utilization of 40%, which
is categorized as light, not moderate. AR Tab 12, Tables 3.9, 3.10, 3.13. While Horse Hill is
categorized as moderate utilization, its historical utilization rates are very light. AR Tab 12,
Table 3.3. Therefore, the BLM did not act arbitrarily and capriciously in implementing the
interim grazing management strategy during drought conditions on these pastures.

On the other hand, plaintiffs are correct that Starvation BC and Steer Canyon Seeding
permit moderate levels of utilization, and have historically met and exceeded the established
utilization levels. AR Tab 12 at Tables 3.7 and 3.11. However, the BLM's interim management
grazing strategy does not permit grazing during the spring on these pastures. AR Tab 12 at Table
7 (Steer Canyon Seeding permits grazing 5/16-5/31 and 7/16-9/31; Starvation BC permits
grazing 7/16-9/30). Accordingly, I cannot find that the BLM acted arbitrarily and capriciously in
failing to consider the need for light utilization levels during times of drought when permitting
spring grazing.

3.      "Hoof Action"

Finally, plaintiffs complain that spring grazing, defined to be the period between
February 1 and May 1, creates a "hazard of compaction of wet soils with hoof action may be
present, resulting in a reduction of infiltration and soil moisture holding capacity in fine-textured
soils." AR Tab 15, Vol. 2 at 381 (emphasis added). They point out that 33 of 96 total stream

reaches and 25 of 30 spring/meadow sites fault "hoof action" as the reason in part for the failures to meet Standards and Guidelines. AR Tab 12 at 4a, Tab 13 at Table 4b.

Given that the Proposed SEORMP identified compaction of wet soils only as a potential drawback of spring grazing, and that plant cover was reported as a factor in the failure of spring/meadow sites to achieve Standards and Guidelines, and more often a factor in failures of stream reaches, defendants were not arbitrary and capricious in determining the interim grazing strategy was an "appropriate action." Furthermore, for the most part, the interim grazing management strategy does not authorize grazing on the pastures between February 1 and May 1, the time that carries the risk of wet soil compaction described above. For the two pastures with some grazing time allocated during springtime, Horse Hill (4/01-7/15) and Louse Canyon (4/15-7/15 and 3/16-8/01), actual 2004 grazing authorizations began after May 1. AR Tab 3 at 1, 26, 29, 32, and 43.

4. <u>Conclusion on the Interim Management Grazing Strategy as "Appropriate Action"</u>

Plaintiffs do not offer an alternative characterization of the photographic evidence from Taylor's description of "general, but subtle, improvement," nor do they specify how the pictures demonstrate that Standards and Guidelines are not being met with the introduction of the interim grazing management strategy. Plaintiffs simply assert that the regulation mandating "significant progress toward fulfillment of the standards" requires more than subtle or general improvement.

However, the agency's interpretation of "significant progress" permits "[m]ovement toward" meeting the Standards and Guidelines. While plaintiffs would like to see significant progress faster, the regulation requires the BLM to implement actions that will result in improvement, and the chosen action appears to have done so. Indeed, examples of the types of

"appropriate action" listed in the Notice upon promulgation of the regulation "include . . .

adjusting the season or duration of livestock use . . . ."  60 Fed. Reg. 9894, 9906 (Feb. 22, 1995)

(final rule amending 43 C.F.R. Parts 1780 and 4100).  In short, I cannot find based on the

evidence before me that the BLM was arbitrary and capricious in determining that the hot season

reduction in grazing was an "appropriate action."

## CONCLUSION

Based on the foregoing, plaintiffs' motion for summary judgment (#10) is denied.

Defendants' motion for summary judgment (#25) is granted.

Dated this _____17th_____ day of August, 2005.


 /s/ Garr M. King_____
Garr M. King
United States District Judge